AO 106 (Rev. 06/09)   Application for a Search Warrant

# UNITED STATES DISTRICT COURT



### for the
### Northern District of Oklahoma

SEP 2 0 2019

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

In the Matter of the Search of )
)
) Case No. 19-mj-188-JFJ
)
200 1/2 North Maple Street, Commerce, Oklahoma; and )
202 North Maple Street, Commerce, Oklahoma )
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment "A"

located in the ___Northern___ District of ___Oklahoma___, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| **21 U.S.C. § 841(a)(1)** | **Possession of Controlled Substance With Intent to Distribute** |
| **21 U.S.C. § 846** | **Conspiracy** |

The application is based on these facts:

**See Affidavit of Billy J. Stites, SA/BIA/DEA, attached hereto**.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

_____
*Billy J. Stites, SA/BIA/DEA*

Sworn to before me and signed in my presence.

Date: ___September 20th, 2019___

_____
*Judge's signature*

City and state: ___Tulsa, Oklahoma___

Jodi F. Jayne, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Billy J. Stites, your Affiant and the undersigned, being duly sworn, depose and say:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant authorizing the search of 200 ½ North Maple Street, Commerce, Oklahoma, hereinafter referred to as LOCATION 1, and 202 North Maple Street, Commerce, Oklahoma, hereinafter referred to as LOCATION 2, more particularly described in Attachment A, annexed hereto, and fully incorporated herein. The items to be seized pursuant to this warrant are described in Attachment B, annexed hereto, and fully incorporated herein.

2. I am a Special Agent with the Bureau of Indian Affairs, Division of Drug Enforcement, and have been employed as such since November 2008. I am currently assigned to the United States Drug Enforcement Administration, Tulsa, Oklahoma Resident Office, as a Task Force Agent. I was previously assigned to the Drug Enforcement Administration, Asheville, North Carolina Post of Duty. I have been assigned to the Drug Enforcement Administration since April 2009.

3. I have been in law enforcement since 2003. I have completed the State of Oklahoma Council on Law Enforcement Education and Training reserve officer and basic police academy (CLEET). I have completed the Federal Criminal Investigator Training Program at the Federal Law Enforcement Training Center (FLETC) located in Glynco, Georgia. During my employment in law enforcement, I have attended training in the areas of drug enforcement to include Dark Web Investigations, Electronic Device Investigations, Clandestine Lab Investigators Certification, Drug Identification, Criminal

Interdiction, NARK II Drug test kit certification, Search and Seizure, Standardized Field Sobriety Testing, Covert Electronic Surveillance, Physical Surveillance, Electronic Surveillance, Diversion Investigations, Financial Investigations, Interstate Trafficking, Air and Ground Interdiction, Money Laundering Investigations and Title III wire investigations both consensual and judicial. I have attended the United States Department of Interior Bureau of Indian Affairs Drug Investigators School, The United States Drug Enforcement Administration Drug Investigators School and The United States Drug Enforcement Administration Advanced Drug Investigators School. I attend at minimum forty hours annually of continuing education in drug enforcement related topics.

4.      During my employment in law enforcement, I have been involved in numerous controlled substance investigations to include the manufacturing, trafficking, distribution, cultivation, possession of controlled substances and money laundering involving the proceeds from the distribution of controlled substances. I have participated in operations involving the surveillance, detection, identification, and seizure of controlled substances, utilizing confidential sources and undercover agents acting in an undercover capacity to purchase controlled substances. Your Affiant has obtained and served numerous search warrants relating to controlled substance violations.

5.      I make this Affidavit in support of a search warrant to search and seize evidence related to violations of Title 21, United States Code, Section 841, possess with intent to distribute controlled substance, and Title 21, United States Code, Section 846, conspiracy to possess with intent to distribute controlled substance.

6.     The information set forth in this Affidavit is known to me as a result of my own investigation, through review of reports or has been communicated to me by other law enforcement personnel.

7.     This affidavit contains information necessary to establish probable cause but does not include each fact known by me or known by the government.

8.     Based upon your Affiant's training, experience and knowledge in this and other drug trafficking investigations, your Affiant has reason to believe that:

a.     Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, possession, sale, and distribution of drugs.  The aforementioned books, records, receipts, notes, ledgers, etc., are usually maintained in the suspect's residence.

b.     Drug traffickers secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences and/or their businesses and automobiles for ready access and to conceal them from law enforcement.

c.     Drug traffickers commonly maintain addresses or telephone numbers in books or on papers, which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization.

d.     Drug traffickers usually keep paraphernalia for cultivating, manufacturing, packaging, diluting, weighing, and distributing their drugs.  That paraphernalia includes but not limited to scales, plastic bags, diluting agents, and weapons for protection of their criminal enterprises.

e.     Drug traffickers attempt to legitimize their profits from the sale of drugs and often place assets in names other that their own to avoid detection of these assets by the government and law enforcement agencies;

f.      Drug traffickers often place assets in names of business/corporate entities as nominee title holders in order to avoid detection of these assets by government and law enforcement agencies, even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

g.      Drug traffickers must maintain and have quick access to large amounts of United States currency or their liquid assets in order to maintain and finance their ongoing drug trafficking business;

h.      Drug traffickers maintain, in their residence and/or business establishments electronically stored data, computerized or written books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale, and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed;

i.      Drug traffickers commonly provide controlled substances on consignment sale to their customers also known as "Fronting," who subsequently pay for the drugs after reselling said drugs.  Therefore, the above-mentioned books, records, receipts, notes, ledgers, etc., will be secured by the drug traffickers within their residence and/or their businesses for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

j.      Drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames addresses and telephone numbers of drug associates within their residence and/or place of

business, their business vehicles, or the curtilage of their residence or business for ready access and to hide them from law enforcement agencies;

k.      Drug traffickers commonly maintain records reflecting names, nicknames, address and telephone numbers of both their current and past drug trafficking associates;

l.      Drug traffickers who are aware of an ongoing criminal investigation will often destroy an existing format of records reflecting their drug transactions (i.e. names of associate who owe them money for drugs and amounts of monies owed and collected);

m.      Drug traffickers who are aware of an ongoing criminal investigation into their drug activities will usually alter their operational methods of drug manufacturing, importation, and distribution in order to hinder law enforcement agencies from detecting their unlawful activities;

n.      Drug traffickers will commonly conceal within their vehicles, residence or businesses, or within the curtilage of their residence or businesses, caches of drugs, large amounts of currency, firearms, financial instruments, precious metals, precious gemstones, jewelry, electronic equipment, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made in drug trafficking activities;

o.      Drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services (i.e., safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and businesses fronts);

p.      Drug traffickers who are aware of a criminal investigation into their drug activities, will conceal, liquidate and transfer easily movable drug-derived assets in order to prevent law enforcement agencies from seizing and forfeiting these assets;

q.     Drug traffickers often have photographs or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds.  These photographs and video movies are normally in the drug traffickers possession, their residence and/or their place of business;

r.     Drug traffickers commonly have firearms in their possession (on their person, at their residence, in their vehicles and/or their business) including but not limited to handguns, rifles, shotguns, and automatic weapons.  These firearms are most often used and/or maintained in order to protect and secure a drug trafficker's property;

s.     Drug traffickers commonly secrete in their vehicles items used in the manufacture and distribution of controlled substances;

t.     Drug traffickers will accumulate and maintain a substantial amount of drug proceeds, specifically currency, over a period of years, so that the proceeds can be used in later years for personal asset acquisitions and/or expenditures during periods when a drug trafficker is not distributing drugs;

u.     Drug traffickers will receive incoming telephone calls and text messages to arrange any type of drug transactions with co-conspirators or associates.  Drug traffickers will also store and maintain sent and received text messages involving drug transactions within cellular telephones. Additionally, drug traffickers often possess and use more than one cellular telephone and commonly keep and store their cellular telephones on their persons, in their residences, and/or in their vehicles.

## FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE

9.     Law enforcement has been investigating the distribution of methamphetamine by several individuals in the Commerce and Miami area of Northeast Oklahoma, within the Northern District of Oklahoma.  These individuals include Jorge

Page 6

Alberto MORENO, Maria I. GONZALEZ, Reyna HERNANDEZ and others. Based on the investigation to date, your affiant believes that MORENO resides at LOCATION 1, GONZALEZ resides at LOCATION 2, and HERNANDEZ resides at 417 F Street Southeast, Miami, Oklahoma.

10.     With respect to LOCATION 1, agents have conducted surveillance of MORENO and have seen MORENO on numerous occasions park his vehicles, a 2014 GMC SUV and a 2008 Chevrolet Avalanche, at LOCATION 1, at the end of the night. See paragraph 33 for a more complete description of the vehicles. Agents have then returned early the next morning to see MORENO leaving from LOCATION 1 to go to his known place of employment, Tracker Marine in Miami, Oklahoma. Additionally, based on a review of vehicle registration records, MORENO's 2014 GMC SUV is registered to MORENO at LOCATION 1. The 2008 Chevrolet Avalanche is registered to Maria Mata, with MORENO listed as a secondary owner and with MORENO's address once again listed as LOCATION 1.

11.     With respect to LOCATION 2, as described below in paragraphs 24 through 26, your Affiant went to LOCATION 2 on August 28, 2019, and spoke with GONZALEZ. When your affiant asked GONZALEZ on that date whether she lived at LOCATION 2, she admitted that she did.

12.     With respect to 417 F. Street Southeast, Miami, in addition to the events witnessed by your affiant and described below, your affiant confirmed that the utilities of that address are registered in HERNANDEZ's name.

13. On March 21, 2019, your Affiant and other agents utilized a confidential informant ("CS1") to purchase approximately one ounce of crystal methamphetamine from MORENO.

14. CS1, under the direction and control of your Affiant and other agents, was outfitted with an audio/video recording device and transmitter to document the meeting with MORENO. As confirmed by the audio and video recordings of the encounter, CS1 met with MORENO at LOCATION 1. CS1 negotiated with MORENO to purchase methamphetamine. CS1 and MORENO stood in front of LOCATION 1. CS1 provided MORENO with $400 in pre-recorded currency and MORENO distributed a cigarette pack with a plastic bag containing a crystalline substance that was later laboratory-tested to be approximately 24 grams of methamphetamine. MORENO remained at LOCATION 1 after CS1 left.

15. On March 27, 2019, your Affiant and other agents utilized CS1 to arrange the purchase of approximately four ounces of crystal methamphetamine from MORENO.

16. CS1, under the direction and control of your Affiant and other agents, was outfitted with an audio/video recording device and transmitter to document the meeting with MORENO. As confirmed by the audio and video recordings of the encounter, CS1 met with MORENO at LOCATION 1. CS1 arrived at LOCATION 1 before MORENO. MORENO arrived at LOCATION 1 driving his 2008 Chevrolet Avalanche. CS1 entered into the Avalanche with MORENO. CS1 provided MORENO $1700 of pre-recorded currency, and MORENO distributed to CS1 two plastic bags containing a crystalline substance that was later laboratory-tested to be approximately 110 grams of methamphetamine. MORENO remained at LOCATION 1 after CS1 left.

17.     On April 22, 2019, your Affiant and other agents utilized CS1 to arrange the purchase of approximately four ounces of crystal methamphetamine from MORENO.

18.     CS1, under the direction and control of your Affiant and other agents, was outfitted with an audio/video recording device and transmitter to document the meeting with MORENO.  As confirmed by the audio and video recordings of the encounter, CS1 met with MORENO at the Dollar General store in Commerce, Ottawa County, Oklahoma at the request of MORENO.  CS1 arrived before MORENO.  As confirmed by agents' surveillance, MORENO left LOCATION 1 and arrived at the Dollar General in the 2008 Chevrolet Avalanche.  As confirmed by the video and audio recordings, CS1 entered the Chevrolet Avalanche and rode with MORENO around several city blocks, including passing LOCATION 1 and LOCATION 2.  Once inside the Chevrolet Avalanche, CS1 provided MORENO with $1700 of pre-recorded currency and MORENO distributed to CS1 a plastic bag containing a crystalline substance that was later laboratory-tested to be approximately 104 grams of methamphetamine.

19.     On August 5, 2019, your Affiant and other agents utilized a confidential informant ("CS2") to a purchase crystal methamphetamine from Maria GONZALEZ.

20.     CS2, under the direction and control of your Affiant and other agents, was outfitted with an audio/video recording device and transmitter to document the meeting with GONZALEZ.  CS2 met with GONZALEZ at LOCATION 2.  CS2 negotiated with GONZALEZ to purchase methamphetamine.  During the negotiation, GONZALEZ left LOCATION 2 and walked to LOCATION 1 next door, presumably to meet with MORENO in an attempt to get the methamphetamine requested by CS2.  GONZALEZ returned without the methamphetamine, explaining that they would have to go

Page 9

somewhere else to get the methamphetamine.   Based on prior investigation into MORENO's employment at Tracker Marine in Miami, your Affiant believes that MORENO was at work and not at LOCATION 1 at the time of the transaction.

21.     CS2, GONZALEZ and another unnamed individual drove near 417 F Street Southeast, Miami, Oklahoma.  GONZALEZ met with Reyna HERNANDEZ near 417 F Street Southeast, where your Affiant observed what appeared to be a hand to hand drug transaction between GONZALEZ and HERNANDEZ.   Once the hand to hand transaction was complete, GONZALEZ returned to the vehicle with CS2 and the other unnamed individual and left the area.  Your affiant confirmed through surveillance that HERNANDEZ then walked back inside 417 F Street Southeast.  As confirmed by the recordings of the encounter, while in the vehicle, CS2 gave $400 in pre-recorded currency to GONZALEZ, and in exchange, GONZALEZ gave CS2 a plastic bag containing a crystalline substance that was later laboratory-tested to be approximately 25 grams of methamphetamine.  After the transaction, GONZALEZ dropped off CS2, and, as confirmed by surveillance, traveled back to LOCATION 2 at the completion of the transaction.

22.     On August 15, 2019, your Affiant and other agents utilized CS2 to attempt to purchase crystal methamphetamine from Maria GONZALEZ.

23.     CS2, under the direction and control of your Affiant and other agents, was outfitted with an audio/video recording device and transmitter to document the meeting with GONZALEZ.  As confirmed by the video and audio recordings of the encounter, CS2 met with GONZALEZ at LOCATION 2, and CS2 negotiated with GONZALEZ to purchase methamphetamine.  In summary, GONZALEZ informed CS2 they would need

Page 10

to drive to another location to pick up the methamphetamine. CS2, GONZALEZ, and two other unnamed individuals drove to Reyna HERNANDEZ's residence at 417 F Street Southeast, Miami, Oklahoma. While sitting in front of 417 F Street Southeast, GONZALEZ advised CS2 they would have to wait for the source of supply, to go on break from work. Based on the location where the conversation took place, and based on my experience and training, I believe that HERNANDEZ was the anticipated source of supply to whom GONZALEZ was referring. CS2 left GONZALEZ and the other individuals, without having obtained methamphetamine, while GONZALEZ and the other individuals drove back to LOCATION 2.

24.     On August 28, 2019, Detective David Wright with the Miami Police Department had obtained information that a juvenile reported missing and/or endangered was possibly staying at LOCATION 2. Your affiant learned that the juvenile was in a relationship with GONZALEZ's son. Your Affiant contacted Chief Ray Horn with the Commerce Police Department, who advised that his officers were aware of this information and had gone to the residence on several occasions and had spoken with GONZALEZ in an attempt to recover the missing juvenile. Chief Horn reported that GONZALEZ would likely deny the juvenile was inside LOCATION 2.

25.     On the same date, your Affiant and other agents went to LOCATION 2 and made contact with GONZALEZ, who allowed your Affiant to enter LOCATION 2. Your Affiant informed GONZALEZ that agents suspected the missing juvenile was inside LOCATION 2, and it would not be a good idea to hide a missing juvenile. GONZALEZ agreed to cooperate and walked into the rear of the residence, requesting

your Affiant to stay by the front door.  GONZALEZ came out with the missing juvenile and turned the juvenile over to the Commerce and Miami Police Department.

26.     While entering LOCATION 2 through the front entrance, your Affiant observed a barricade designed to keep anyone from opening the door wider than to allow a single person to pass.  The barricade is described as a large chunk of wood held to the floor with large nails, allowing the door to open approximately the width of a single human body turned sideways.  Based on my experience and training, the barricade is a tool designed to help shield illicit items from view.  If law enforcement or other persons deemed undesirable arrived at the house, the barricade would prolong the time the occupants would have to destroy or dispose of items of contraband.  Your Affiant also observed a surveillance camera sitting on the counter facing the front door.  In my experience and training, drug traffickers often have surveillance equipment to allow them to monitor who is approaching the location where their drugs or drug proceeds are kept.

27.     On the same date, Detective David Wright interviewed the recovered missing juvenile, identified hereinafter as S.R.  S.R. informed Detective Wright he/she had only arrived at LOCATION 2 the day before.  S.R. informed Detective Wright he/she had been using methamphetamine.  S.R. alluded to using the methamphetamine inside LOCATION 2, but would not directly implicate GONZALEZ.  Detective Wright believes S.R. is in a continued relationship with GONZALEZ's son and showed signs of loyalty toward GONZALEZ.

28.     On September 12, 2019, your Affiant and other agents utilized a confidential informant ("CS3") to purchase crystal methamphetamine from Maria GONZALEZ.

29.     CS3, under the direction and control of your Affiant and other agents, was outfitted with an audio/video recording device and transmitter to document the meeting with GONZALEZ. As confirmed by audio and video recordings of the encounter, CS3 met with GONZALEZ at LOCATION 2, and CS3 negotiated with GONZALEZ to purchase methamphetamine. CS3 gave GONZALEZ $300 in pre-recorded currency and GONZALEZ distributed two plastic bags with suspected crystal methamphetamine. The substance field-tested positive for methamphetamine, and has been sent to a law enforcement laboratory for confirmation of substance and determination of weight.

30.     On September 16, 2019, your Affiant and other agents utilized CS3 to purchase crystal methamphetamine from Maria GONZALEZ.

31.     CS3, under the direction and control of your Affiant and other agents, was outfitted with an audio/video recording device and transmitter to document the meeting with GONZALEZ. As confirmed by the audio and video recordings of the encounter, CS3 went to LOCATION 2 and encountered a person whom CS3 recognized as one of GONZALEZ's sons. GONZALEZ's son informed CS3 that GONZALEZ was not at home. GONZALEZ's son contacted GONZALEZ by phone and, after speaking with GONZALEZ in what your affiant believes to be Spanish, gave CS3 instructions in English to pick up GONZALEZ, near the Quapaw Casino on South 580 Road in Miami Oklahoma. The CS left LOCATION 2, and agents surveilled CS3 as CS3 picked up GONZALEZ at the appointed location and traveled back with GONZALEZ to LOCATION 2. CS3 negotiated with GONZALEZ to purchase methamphetamine. The recordings then show GONZALEZ contacting a methamphetamine source of supply over

the phone to have methamphetamine delivered.   CS3 gave GONZALEZ $1000 in pre-recorded currency.

32.   A short time after GONZALEZ made the phone call, your Affiant observed MORENO arrive at LOCATION 1, exit his 2014 GMC SUV, leaving his driver's side door open, and walk between LOCATION 1 and LOCATION 2.   At the same time, GONZALEZ exited LOCATION 2 out the back of the residence. LOCATION 1 and LOCATION 2 share a small walking path behind the houses where your Affiant believes GONZALEZ and MORENO met out of sight of agents.   A short time after GONZALEZ and MORENO both walked behind their houses, GONZALEZ re-entered LOCATION 2 and met with CS3, while MORENO re-entered his vehicle and left the area.    GONZALEZ then distributed a plastic bag with suspected methamphetamine to CS3.   GONZALEZ remained at LOCATION 2 after CS3 left.   The substance field-tested positive for methamphetamine, and has been sent to a law enforcement laboratory for confirmation of substance and determination of weight.

33.   Your Affiant routinely observes MORENO going in and out of LOCATION 1 along with both of MORENO's vehicles, described as (1) 2014 GMC Sport Utility Vehicle bearing Oklahoma license plate ADA244;   VIN: 1GKKRPKD3EJ104835 and (2) 2008 Chevrolet Avalanche bearing Oklahoma license plate CSH855, VIN: 3GNEC12078G270681.

34.   Your Affiant believes (1) MORENO utilizes LOCATION 1 as a residence and storage location for crystal methamphetamine, (2) GONAZALES utilizes LOCATION 2 as a residence and base of operation to run her methamphetamine distribution business, (3)  GONZALEZ is supplied methamphetamine by HERNANDEZ

Page 14

at 417 F Street Southeast, Miami, Oklahoma when MORENO is unavailable to supply

GONZALEZ, and (4) MORENO, GONZALEZ, HERNANDEZ, and other individuals

are conspiring to traffic in and distribute crystal methamphetamine within the Northern

District of Oklahoma.

35.     CS1 has worked intermittently with the BIA, DEA and Oklahoma Bureau

of Narcotics since 2019.  The CS has a criminal history of child support violations,

vehicle theft, stolen property, assault, drug/firearm possession and drug distribution.  The

CS has provided information, which has been independently corroborated when possible.

The CS has assisted the agencies, which have led to the seizure of methamphetamine.

While working on investigations with your Affiant, the CS has not provided information

that has been deemed false or misleading.  Currently, the CS is working for monetary

compensation.

36.     CS2 has worked with the BIA and DEA since 2019.  The CS has a

criminal history of drug possession, grand larceny, uttering forged instrument, stolen

vehicle, driving under the influence, and embezzlement.   The CS has provided

information that has been independently corroborated when possible.   The CS has

assisted law enforcement, which has led to the seizure of methamphetamine and stolen

vehicles, arrest of fugitives and seizure of methamphetamine.   While working on

investigations with your Affiant, the CS has not provided information that has been

deemed false or misleading.  Currently, the CS is working for monetary compensation.

37.     CS3 has worked intermittently with the BIA and DEA since 2016.  The CS

has a criminal of obtaining merchandise by means of bogus check, violation of

compulsory education act and aiding/abetting minor in need of supervision.  The CS has

provided information that has been independently corroborated when possible. The CS has assisted law enforcement, which has led to the seizure of methamphetamine and conviction of multiple defendants. While working on investigations with your Affiant, the CS has not provided information that has been deemed false or misleading. Currently, the CS is working for monetary compensation.

38.     Your Affiant knows that methamphetamine is a schedule II controlled substance.

## CONCLUSION

39.     Based on the foregoing observations and information that probable cause exists to search LOCATIONS 1 and 2 and their contents, vehicles, curtilage, outbuildings, or appurtenances thereof, for evidence of controlled substance violations, your Affiant respectfully requests the court issue a warrant authorizing the search of LOCATIONS 1 and 2 and its contents, vehicles, curtilage, outbuildings, or appurtenances thereof, related to violations of Title 21, United States Code, Section 841, possess with intent to distribute controlled substances and Title 21, United States Code, Section 846, conspiracy to possess with intent to distribute controlled substances, allowing your Affiant or any federal law enforcement officer, tribal police, sheriff, deputy sheriff, police officer or law enforcement officer with proper assistance to enter LOCATIONS 1 and 2.

I hereby certify that the above is true and correct to the best of my knowledge.

Respectfully submitted,

Billy J. Stites
BIA Special Agent
DEA Task Force Agent

Subscribed and sworn to before me on September 20th, 2019

JODI F. JAYNE
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF OKLAHOMA

## ATTACHMENT A

LOCATION 1

Google Global Positioning System coordinates (36.935170, -94.871492)

Jorge MORENO residence located at 200 ½ North Maple Street, Commerce, Oklahoma, within the Northern District of Oklahoma and its contents, vehicles, curtilage, outbuildings, or appurtenances thereof, for evidence of controlled substance violations.





## ATTACHMENT A

LOCATION 2

Google Global Positioning System coordinates (36.935302, -94.871711)

Maria GONZALEZ residence located at 202 North Maple Street, Commerce, Oklahoma, within the Northern District of Oklahoma and its contents, vehicles, curtilage, outbuildings, or appurtenances thereof, for evidence of controlled substance violations.





# ATTACHMENT B

**Property to be seized:**

1.      Any controlled dangerous substances to wit; methamphetamine and other controlled substances, paraphernalia commonly used in the consumption, distribution and manufacture of controlled substances, including but not limited to, scales, other weighing or measuring devices, sifters, containers, bottles, tubing, plastic bags, packing material, formulas, drug processing equipment, smoking devices;

2.      Books, records, receipts, notes, ledgers and other papers relating to the transportation, ordering, purchase and distribution of controlled substances, in particular, methamphetamine and other controlled substances;

3.      Papers, tickets, notes, receipts, and other items relating to domestic and international travel;

4.      Books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letter of credit, money orders, bank drafts, and cashier's checks, safe deposit box keys, money wrappers, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

5.      Electronic equipment such as cellular telephones, which are expected to contain dialed or received numbers, contact lists, text messages, personal digital assistants, computers, hard drives, portable hard drives, telex machines, facsimile machines, currency counting machines, telephone answering machines, and related manuals used to generate, transfer, count, record, and/or store the information described

in items 1, 2, 3, and 4, of this exhibit. Additionally, computer software, tapes and discs, audiotapes, and the contents therein, containing the information generated by the aforementioned electronic equipment;

6. Answering and recordings of in-coming telephone calls from associates or co-conspirators arranging for delivery or wanting to purchase controlled substances.

7. Proceeds of drug trafficking including, United States and foreign currency, precious metals, jewelry, and financial instruments, including stocks and bonds;

8. Photographs, including still photos, negatives, video tapes, films, undeveloped film and the contents therein, slides, in particular photographs of co-conspirators, of assets and/or controlled substances;

9. Books and records documenting drug related debts, transactions and persons associated thereto, including but not limited to address, books, telephone books, ledgers, rolodex indices and any papers reflecting names, addresses, telephone numbers of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

10. Indicia tending to establish the identity of the person or persons occupancy, residency, rental and/or ownership of the premises described herein, or vehicles, including but not limited to utility company receipts, telephone bills, canceled mail envelopes, rental, purchase or lease agreements, vehicle registration, and keys;

11. Firearms and ammunition, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine-guns, other illegal weapons and any records or receipts pertaining to firearms and ammunition;

12.     Any other tangible medium, together with the means and instruments, and all other property, constituting evidence of violations of the law concerning the trafficking of controlled substances.